# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DO NO HARM,
11357 Nuckols Rd., Pmb 115
Glen Allen, VA 23059

*Plaintiff,*

v.

No. 1:25-cv-638

AMERICAN CHEMICAL SOCIETY,
1155 16th St., NW
Washington, DC 20036

*Defendant.*

## VERIFIED COMPLAINT

Do No Harm brings this action against the American Chemical Society under the Civil Rights Acts of 1866, 42 U.S.C. §1981, and the Civil Rights Act of 1964, 42 U.S.C. §2000d et seq. Do No Harm seeks declaratory relief, injunctive relief, and nominal damages.

1.     The Reconstruction Congress enacted the Civil Rights Act of 1866 to ensure that "citizens of every race and color" can equally "make and enforce contracts." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976) (cleaned up). Better known as §1981, this statute guarantees all Americans the "same right," 42 U.S.C. §1981(a), to "'make and enforce contracts' without respect to race," *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006). And Congress later enacted Title VI of the Civil Rights Act of 1964 to root out racial discrimination by entities that accept federal financial assistance. "No person in the United States shall, on the ground of race, color, or

1

national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d.

2.      The American Chemical Society is violating §1981 and Title VI. The Society operates a program that contracts with only certain races. Its ACS Scholars Program could not be clearer that it's open only to black, Hispanic, and indigenous Americans. White and Asian applicants are not eligible.



**The ACS Scholars Program is open to:**

- U.S. citizens or a legal permanent U.S. residents (please inquire via email if you have questions regarding asylum or DACA status)
- African descent or Black, Hispanic or Latina/Latino/Latinx, or Indigenous (e.g. Native American, Native Hawaiian, Pacific Islander, Alaskan Native) (please see below for more details)

3.      "[R]acial discrimination is invidious in all contexts," *SFFA v. Harvard*, 600 U.S. 181, 214 (2023) (cleaned up), including chemistry. When Congress chartered the Society in 1938, it wanted the Society to improve the "qualifications and usefulness of chemists through high standards of professional ethics, education, and attainments." ACS, *ACS Governing Documents*, *Original Charter (Superseded)* (Jan. 1, 2025), perma.cc/59RW-WZBG. Racial discrimination is antithetical to those very standards. The Society is passing over highly qualified, aspiring chemistry professionals for no reason other than their skin color or ancestry.

4.     Aside from betraying its reason for existence, the Society is violating federal law. The ACS Scholars Program is a contract. Recipients must sign and agree to various requirements and give the Society important legal rights in exchange for the chance to win a valuable scholarship. Yet the Society deprives white and Asian students the "same right" to make and enforce those contracts. 42 U.S.C. §1981(a).

5.     And the ACS Scholars Program also constitutes a federal "program or activity." §2000d-4a. The Society is subject to Title VI because it receives "federal financial assistance" in the form of "a tax deduction for charitable contributions," which "operates" as "a Government matching grant." *McGlotten v. Connally*, 338 F. Supp. 448, 462 (D.D.C. 1972) (three-judge panel).

6.     Though the tax-exempt status alone does not render an organization a federal program or activity in other circumstances, the charitable-contribution deduction does when it comes to racial discrimination and Title VI. *Id.* For organizations to obtain 501(c)(3) status and the ability to deduct charitable contributions, they must be charitable. It's beyond "any doubt" that racial discrimination is uncharitable and violates fundamental public policy. *Bob Jones Univ. v. United States*, 461 U.S. 574, 592-93 (1983).

7.     In other words, agreeing not to racially discriminate is a condition for obtaining the 501(c)(3) status and the ability to deduct charitable contributions. *See id.* Our history confirms that "the cancer of racial discrimination" must be dealt with

"strict[ly]." *McGlotten*, 338 F. Supp. at 459 n.58 (cleaned up). The government's provision of the charitable-contribution deduction thus brings the Society's flagrant racial discrimination "within the scope of the 1964 Civil Rights Act." *Id.* at 462.

8.    Worse, the Society continues to receive tens of millions of dollars from contracts with the federal government, USA Spending, *American Chemical Society* (last visited Mar. 5, 2025), perma.cc/U9AN-5SJ3—meaning its discrimination is effectively "subsidize[d]" by "public funds," *Barbour v. WMATA*, 374 F.3d 1161, 1170 (D.C. Cir. 2004). Especially in 2025, federal contractors should know that their "contracting practices" cannot "consider race" in "ways that violate the Nation's civil rights laws." Exec. Order 14,173, §3(b)(iii) (Jan. 21, 2025). These practices promote "an unlawful, corrosive, and pernicious identity-based spoils system" and "threaten the safety of American men, women, and children across the Nation." §1.

9.    Do No Harm has at least one member who tried to apply for the Society's scholarship but who was told that she's ineligible because she's the wrong race. And she will be excluded again in the future, absent an order from this Court forcing the Society to stop discriminating.

10.    "Eliminating racial discrimination means eliminating all of it." *Harvard*, 600 U.S. at 206. That principle will decide this case, and it entitles Do No Harm to relief.

## PARTIES

11.    Plaintiff, Do No Harm, is a nationwide membership organization of healthcare professionals, students, patients, and policymakers who want to protect healthcare from radical, divisive, and discriminatory ideologies. Do No Harm's purpose is to keep these ideologies out of medical education, clinical practice, and research fields.

12.    Do No Harm accomplishes its mission through education and advocacy against dangerous ideas being embedded in medicine and related fields. It has, among other things, sued the federal government for introducing discriminatory "equity" criteria into Medicare, sued private medical and health-research organizations for creating racially exclusive fellowships, and filed administrative complaints against schools that create fellowships and scholarships that exclude students based on race.

13.    Do No Harm has at least one member who tried to apply for the ACS Scholars Program in 2025, is ready and able to apply again, and would apply for the next open cycle after a court orders the Society to stop considering race.

14.    Defendant, American Chemical Society, is a 501(c)(3), nonprofit corporation. The Society is headquartered in Washington, D.C., which is also the Society's principal place of business.

## JURISDICTION AND VENUE

15.    This Court has subject-matter jurisdiction under 28 U.S.C. §1331.

16.    Venue is proper under 28 U.S.C. §1391 because the Society resides here and a substantial part of the events and omissions giving rise to the claim occurred here.

# FACTUAL ALLEGATIONS

## I.    The American Chemical Society operates a race-based scholarship program.

17.    The Society operates the ACS Scholars Program. Ex. A, ACS, *Scholars Program* (last visited Mar. 5, 2025), perma.cc/5VRR-G9EP.

18.    The Society awards graduating high-school seniors and college students up to $5,000 per academic year to help pay for college tuition and fees. *Id.*; *see also* Ex. B, ACS, *How to Apply for the Scholars Program* (last visited Mar. 5, 2025), perma.cc/Z6L7-3PC5.

19.    The money can only be used for "tuition," "academic fees," and up to $500 in "textbooks." Ex. C, ACS, *Current Recipients* (last visited Mar. 5, 2025), perma.cc/P49V-LDAP. Once those expenses are covered, "any excess" money "must be returned" to the Society. *Id.*

20.    The scholarship is renewable. So an ACS scholar who is enrolled in a four-year program can keep getting the scholarship for up to ten semesters. *Id.*

21.    To be eligible, the applicant must be a U.S. citizen or permanent resident. Ex. B. And she must be a full-time student at a high school (for graduating high school seniors) or at an accredited college (for college students). *Id.*

22.    The applicant also must demonstrate high academic achievement in chemistry or science (GPA average 3.0 or higher) and intend to major—or already be majoring in—an eligible field. *Id.* The Society considers the following, among others, to be

"eligible majors": chemistry, biochemistry, toxicology, pharmaceutical chemistry, food science, and forensic science. *Id.*

23.     In addition, the applicant is "expected" to pursue a career in chemistry. *Id.* The Society considers the following, among others, to be "eligible career goals": MD/PhD (research physician), chemist, biochemist, and science journalist. *Id.* As of 2020, over 450 ACS Scholars received a Ph.D., M.D./Ph.D., M.D., or Pharm.D. *See* ACS, *25th Anniversary American Chemical Society Scholars Program Impact Report* 9 (2020), perma.cc/H99Y-WVY4.

24.     To apply, applicants must create an account on the Society's website, submit a transcript from their school, and submit two letters of recommendation (one of which must come from a chemistry, science, or math teacher). Ex. B.

25.     The Society says it selects scholarship recipients based on its view of "the best overall candidates"—evaluating applicants' academic records, career objectives, leadership ability, participation in school activities, academic research, and community service. *Id.*

26.     But the Society limits eligibility for the ACS Scholars Program to "historically underrepresented groups." Ex. A. The program, in other words, "provides underrepresented minority undergraduates with scholarship and mentoring support." ACS, *Fast Facts About ACS* (last visited Mar. 5, 2025), perma.cc/X8FE-NSUP.

27.     The Society doesn't consider non-Latino white students or Asian students to be underrepresented. "Because white students and (broadly-speaking) Asian/Asian

American students are more strongly represented in Chemistry at large," the Society explained, the "ACS Scholars program is available to individuals who identify as African American, Hispanic, or American Indian, or those who identify as multi-ethnic including one of those identities." ACS, *ACS Scholars Program 1995-2016 Survey Analysis Report* 11 (2016), perma.cc/P4L9-PTYY; *accord id.* at 3 n.b (similar).

28.    On its "Am I Eligible?" webpage, the Society states that applicants must be of "African descent or Black, Hispanic or Latina/Latino/Latinx, or Indigenous (e.g., Native American, Native Hawaiian, Pacific Islander, Alaskan Native)." Ex. B.

29.    To remove any doubt, the Society precisely defines these racial and ethnic categories. "Hispanic or Latina/Latino/Latinx" means "[a] person of Mexican, Puerto Rican, Cuban, Central or South American culture or origin, regardless of race." *Id.* "Indigenous" means "[a] person having origins in any of the original peoples of North America, and who maintains cultural identification through tribal affiliation or community recognition." *Id.* "Native Hawaiian" or "Native Pacific Islander" means "[a] person having origins in any of the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands that are U.S. territories." *Id.* And "African decent or Black" means "[a] person having origins in any of the black, indigenous, [and] racial groups of Africa." *Id.* If an applicant is of more than one race, the Society requires the applicant to be "[a] person having origins in more than one of the above racial categories." *Id.*

30.    Non-Latino whites and most Asians are excluded from the Society's list. They are ineligible to apply for the ACS Scholars Program. The program, as the Society

puts it bluntly, "is for African American/Black, Native American/American Indian and Hispanic or Latino" students. Ex. C.

31.    To enforce this racial and ethnic bar, the Society requires applicants to "select the race/ethnicity that [they] *most* identify with." Ex. B. Lest applicants of other races think they can select "Other," the Society tells applicants to "use the 'Other' field to provide more context (for example[,] your tribe, family's country of origin … or other races you are mixed with)." *Id.* And listed as one of the "Conditions for Acceptance of the Award," the Society says "[e]ach scholar must acknowledge that all information provided in the application (particularly ethnicity, intended major, and intended career goal) is true to the best of their knowledge." Ex. C.

32.    The Society enforces its racial and ethnic bar with scientific precision. Over the years, the Society has selected over 3,500 scholars—not one of whom it has ever suggested is non-Hispanic white, East Asian, South Asian, or otherwise outside its three preferred groups. In 2010, ACS Scholars were reportedly 55% black, 39% Hispanic, and 6% American Indian. Editor's Page, *Celebrating ACS Scholars*, C&EN (Jan. 25, 2010), perma.cc/LS2N-HF6B. Ten years later, the Society reported that its 3,500 scholars were 48% black, 45% Hispanic, and 7% American Indian—with "Other" listed as ">1%." *Impact Report*, supra, at 9. Over the program's history, the number of scholars who identified as "solely" white or "Asian/Asian American" is "few to none." *1995-2016 Survey*, supra, at 11. Only 33% of the ACS Scholars reported that they were first-generation college students. *Id.* at 3.

33.    Discrimination has always been the program's purpose as well. Per the Society, the program "was created to increase the number of African American, Hispanic, and American Indian" chemistry professionals. *Impact Report*, supra, at 7; *accord id.* at 5 ("The ACS Scholars Program" was "created to 'change the face of chemistry' by increasing representation of Black/African-American, American Indian, and Hispanic/Latinx in the chemical enterprise."); *id.* at 3 (similar). Still today, the program remains "intended to address the gap in representation in the chemical sciences by awarding scholarships to Black/African-American, Hispanic or Latino, and Native American students." *1995-2016 Survey*, supra, at 2; *accord* ACS, *American Chemical Society Scholars Program 2019 Program Summary* 2 (2019), perma.cc/G73Y-CC98.

## II.    The ACS Scholars Program is a contract.

34.    The ACS Scholars Program involves many contracts, including the "Terms of Use," "Privacy Policy," "Rules and Regulations," and "ACS Student Membership."

35.    To apply to the ACS Scholars Program, applicants must first create an account on the Society's website. Creating an account requires applicants to agree to the Society's "Terms of Use." ACS, *Create Your ACS ID* (last visited Mar. 5, 2025), perma.cc/5QMU-9MQ8. The Terms are a "binding agreement" between the Society and the applicant. ACS *Terms of Use and Legal Disclosures* (last visited Mar. 5, 2025), perma.cc/66CY-AKNU.

36.    Through the Terms, the Society gains important legal rights. For example, the applicant agrees to various limitations on using the Society's website and information. *Id.* The applicant also "agrees to release [the Society]" from "all claims, demands, and damages" associated "with dealing with other users" on the Society's platform. *Id.* The applicant "agrees to defend, indemnify and hold harmless [the Society]" for certain claims. *Id.* And the applicant agrees to choice-of-law and forum-selection clauses. *Id.*

37.    To create an account, the applicant also must agree to the Society's Privacy Policy. *Create Your ACS ID*, supra. In the Privacy Policy, the applicant "agree[s]" to let the Society "transfe[r]" and "stor[e]" her personal information. ACS, *Privacy Policy* (last visited Mar. 5), perma.cc/9EY7-SY63. The Society also gets to use the applicant's personal information for targeted advertising. *Id.* And the Society gains the right to share the applicant's personal information with third parties. *Id.*

38.    In exchange for agreeing to the Terms of Use and the Privacy Policy, the applicant gains access to the application for the ACS Scholars Program.

39.    The ACS Scholars Program separately forms another contract with scholarship recipients. "When accepting" the scholarship of up to $5,000, scholars must "agre[e]" to the Society's "rules and regulation[s]." Ex. C.

40.    Those rules impose many binding obligations. For example, the recipient must agree to remain a full-time chemistry major. *Id.* If she wants to change her major, she must "notify the ACS Scholars Staff and withdraw from the program as soon as

11

possible, or otherwise refund the American Chemical Society all monies provided post-change of major." *Id.* The recipient also gives up her right to freely transfer schools. Though "[t]ransferring a scholarship to another institution is permissible *at the beginning of an academic year*[,] [t]he Scholar must notify the American Chemical Society of the intent to transfer." *Id.* And if the recipient wants to transfer "at other times," then she must submit a written request to the Society at least 30 days before the start of the semester and to give the Society "the sole discretion" whether to "permi[t]" the transfer of scholarship. The recipient also agrees to maintain at least a 3.0 GPA, absent a "waive[r]" from the Society. *Id.* And the recipient agrees to let the Society's program manager retain her academic and personal records for one year. *Id.*

41.    In exchange for the recipient's agreement to participate in the ACS Scholars Program, the Society promises to pay the money. It also promises to give first-time recipients "one free year of student membership." *Id.* (If the recipient is already a member, then the Society promises to "refund" the membership fee already paid or to apply it to the next year. *Id.*) The premium version of the Society's student membership costs $25 a year. *See* ACS, *Membership – Students* (last visited Mar. 5, 2025), perma.cc/FXN4-9RET.

42.    The ACS Student Membership forms a separate contract between the student and the Society. In exchange for paying the membership fee (and agreeing to the Terms of Use and Privacy Policy), the Society agrees to give digital access to its publication (C&EN Magazine Weekley), access to the Society's webinars and networking

workshops, the ability to vote in the Society's internal elections, discounted rates to various chemistry journals, and up to 40% discounts for the Society events. ACS, *Benefits and Pricing* (last visited Mar. 5, 2025), perma.cc/77R3-E4FG.

43.    ACS Scholars also get exclusive opportunities to compete for "internships" with the country's biggest chemical companies. ACS, *ACS Scholars Internships & Scholarships through SCI* (last visited Mar. 5, 2025), perma.cc/J7N4-C2VM.

## III.    The ACS Scholars Program discriminates against Do No Harm's members.

44.    Do No Harm has at least one member who is harmed by the Society's racial discrimination, including Member A.

45.    Member A is a member of Do No Harm.

46.    Member A is currently a senior in high school. Member A will turn 18 in the spring of 2025.

47.    Member A joined Do No Harm and is participating in this lawsuit with the consent of her mother, who is also a member of Do No Harm. Member A's mother represents her interests until she turns 18. She consents to Member A's membership in Do No Harm and her participation in this lawsuit.

48.    Member A meets all the nonracial eligibility requirements for the ACS Scholars Program.

49.    Member A is a U.S. citizen. She will be a full-time student at a college this fall. Member A will major in chemistry.

50.     While currently exploring her interests and considering various options, Member A wants to pursue a career in chemistry. Member A will soon shadow a toxicologist. And she is interested in exploring other chemistry-related jobs too.

51.     Member A is in good academic standing and has excellent grades. Her GPA is 4.35, and she scored 35 overall in the ACT and a perfect 36 in the science portion of the ACT. She also scored a perfect 5 on the AP Chemistry exam. She enjoys being in a lab and working on chemistry projects.

52.     Member A is involved in various activities at her school and has demonstrated exceptional leadership skills. She has played sports throughout high school and helps coach a local sports team. She is involved with her school's honors choir and has performed in numerous public events. She was in student government for two years and now helps run a Bible study.

53.     This year's application cycle for the ACS Scholars Program opened in December 2024 and closed on March 1, 2025. *See* Ex. B.

54.     In January 2025, Member A tried to apply for the ACS Scholars Program. She was prepared to submit an official high-school transcript, and she knew which teachers she would list as recommenders.

55.     Member A is half non-Latino white and half South Asian. When Member A revealed her racial and ethnic background on the Society's application portal, the Society told her that she was "ineligible" for the scholarship. She received the following message and was unable to proceed:

**Thank you for your interest in an ACS Scholars Scholarship.**

Based on the information you provided you are ineligible for the program. For questions about the eligibility criteria, please refer to our website's How to Apply page.

We wish you the best of luck on your academic and educational pursuits. If you have any other questions, please contact us at scholars@acs.org.

56.     Member A finds it hurtful and unfair that the Society would use her race and ethnicity, which she can't control, to exclude her from applying for the ACS Scholars Program.

57.     Member A would use the scholarship toward her college tuition and fees. Though her parents have saved some money for her college, those savings will not cover all her tuition and fees. The scholarship would help Member A avoid taking on debt.

58.     Member A has applied to and is currently applying to various college scholarships. She has applied for scholarships available through her college, and she has compiled a list of other scholarships she qualifies for. She has applied to many already, and she is currently applying for many more.

59.     If a court orders the Society to make the ACS Scholars Program nondiscriminatory, then Member A is ready and able to apply to the program's next open cycle—first in 2026, then again in 2027, and then again in 2028.

60.     If accepted, Member A will meet the program's rules and regulations and follow all necessary steps.

61.    Member A is pseudonymous because she is a minor who is planning to attend college; and if her participation in this litigation becomes public, she fears reprisal from other students on campus, her professors, school administrators, future employers, and the public. Member A also does not want the Society to hold her involvement in this lawsuit against her when selecting future scholarship recipients.

## CLAIMS FOR RELIEF
### COUNT I
### Violation of the Civil Rights Act of 1866
### (42 U.S.C. §1981)

62.    Do No Harm repeats and realleges the preceding allegations.

63.    The American Chemical Society is violating §1981 by intentionally excluding certain applicants from contractual relationships through the ACS Scholars Program and offering different terms of use to certain users because of their race and ethnicity.

64.    Section 1981 guarantees "[a]ll persons … the same right … to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. §1981(a). The Act prohibits discrimination by "nongovernmental" actors like the Society. §1981(c). And it authorizes equitable and legal relief, including damages. *Johnson v. Ry. Express Agency*, 421 U.S. 454, 459-60 (1975).

65.    Member A is protected by §1981, whose "broad terms" bar discrimination "against, or in favor of, any race." *McDonald*, 427 U.S. at 295. Titled "Equal rights under the law," §1981 "guarantee[s] continuous equality between white and nonwhite citizens," *Jam v. Int'l Fin. Corp.,* 586 U.S. 199, 208 (2019), by protecting the "equal right of

16

all persons … to make and enforce contracts without respect to race," *Domino's*, 546

U.S. at 474 (cleaned up).

66.    Section 1981 "protects 'would-be contractor[s]' … to the same extent that

it protects contracting parties." *Am. All. for Equal Rts. v. Fearless Fund Mgmt. LLC*, 103

F.4th 765, 776 (11th Cir. 2024). The statute broadly "offers relief when racial discrimi-

nation blocks the creation of a contractual relationship." *Domino's*, 546 U.S. at 475.

67.    "The term contract, as used in §1981, refers to a right in the promisee

against the promisor, with a correlative special duty in the promisor to the promisee of

rendering the performance promised." *Adams v. McDougal*, 695 F.2d 104, 108 (5th Cir.

1983) (cleaned up). Stated differently, a contract is "'an agreement to do, or refrain from

doing, a particular thing, upon sufficient consideration.'" *Fearless Fund*, 103 F.4th at 775

(quoting 17A Am. Jur. 2d Contracts §1).

68.    The ACS Scholars Program involves contracts. A scholarship recipient

must "agre[e]" to the Society's "rules and regulation[s]," Ex. C. A scholarship agreement

like this one—where the Society agrees to pay the recipient money "in exchange for

[her] meeting certain eligibility criteria"—is a "clear contract." *Newman v. Howard Univ.*

*Sch. of Law*, 715 F. Supp. 3d 86, 104 (D.D.C. 2024). "[E]ach party promised to do some-

thing, and the promises depended on one another." *Id.* (citing *Eastbanc, Inc. v. Georgetown*

*Park Assocs. II, LP*, 940 A.2d 996, 1003 (D.C. 2008)). And under this program, Mem-

ber A would also gain a free membership to the Society, with all its rights and benefits,

for a year. But to apply or become a member, she must agree to the Society's Terms of

17

Use and Privacy Policy—two more obvious contracts that give the Society important legal rights.

69.    The Society is violating §1981 by intentionally limiting the formation of contractual relationships and by offering differing contractual terms based on race and ethnicity. Black, Latino, and indigenous users who agree to the Society's Terms of Use and Privacy Policy gain access to the applications for the ACS Scholars Program and are eligible to apply. By contrast, white and Asian users who agree to the same agreements to gain access to the applications for the ACS Scholars Program are told they are ineligible.

70.    A policy that is "discriminatory on its face" supplies "direct evidence" of discriminatory intent. *Trans World Airlines v. Thurston*, 469 U.S. 111, 121 (1985). So does "a corporate decision maker's express[ed] desire to avoid" contracting with members of a certain race. *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006) (cleaned up). Here, there's both. The Society's eligibility criteria are "discriminatory on its face," *Thurston*, 469 U.S. 111, 121, because they limit eligibility to black, Latino, and indigenous students. And the Society's "corporate decision maker[s]" have expressed a "desire to avoid" contracting with students who aren't black, Latino, or indigenous. *Amini*, 440 F.3d at 359. The Society has repeatedly stated that the ACS Scholars Program is only for underrepresented minority students whom it defines as black, Latino, and indigenous. So Do No Harm "is not required to make any further allegations of discriminatory intent or animus." *Juarez v. Nw. Mut. Life Ins.*, 69 F. Supp. 3d 364, 370 (S.D.N.Y. 2014).

71.    Race caused Member A's "'loss of a legally protected right'" to compete for contracts. *Newman v. Amazon.com*, 2022 WL 971297, at *7 (D.D.C. Mar. 31). "So long as the plaintiff's [race] was one but-for cause of that decision, that is enough." *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). But for the fact that Member A is half white and half South Asian, she would have had the "same right" as black, Latino, and indigenous students to apply for the ACS Scholars Program and to "make … contracts" with the Society. §1981(a). But because Member A is half white and half Asian, the Society told her she was ineligible. And she will continue to be ineligible—or at least significantly disadvantaged—for that reason.

72.    The Society's discrimination cannot survive strict scrutiny. *See Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003). "[A]ll racial classifications … must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors v. Pena*, 515 U.S. 200, 227 (1995). The Society "bears the burden to prove that the reasons for any racial classification are clearly identified and unquestionably legitimate." *Fischer v. UT-Austin*, 570 U.S. 297, 310 (2013) (cleaned up).

73.    There is no compelling interest that justifies categorically excluding white and Asian applicants based on race or ethnicity. The Supreme Court has recognized compelling interests in the use of race in only the narrowest of circumstances where those preferences are explicitly designed to remedy recent acts of discrimination and to make the *individual subjects* of that discrimination whole. *Harvard*, 600 U.S. at 207. The Society has no "specified, identified instances" of recent "past discrimination" that its

scholarship is trying to remedy. *Id.* Instead, the Society simply believes that it needs to balance out the percentage of "[u]nderrepresented students" who are college aged (~33% of U.S. citizens) with the percentage of chemistry-related bachelor's degrees and PhDs held by underrepresented students (18% and 11%, respectively). *See* Ex. B. Such "outright racial balancing" is illegitimate. *Harvard*, 600 U.S. at 223 (cleaned up). At the "heart" of "equal protection lies the simple command that" every individual be treated "as individuals, not as simply components of a racial … class." *Id.*

74.    Nor is the Society's program narrowly tailored to achieve any compelling interest. A categorical exclusion of entire racial groups is, by definition, not narrowly tailored. White and Asian students' race operates as a negative against them. The Society's use of race for the ACS Scholars Program over the last 30 years also has no end point. The Society considered no race-neutral alternatives. And more.

**COUNT II**
**Violation of the Civil Rights Act of 1964**
**(42 U.S.C. §2000d et seq.)**

75.    Do No Harm repeats and realleges the preceding allegations.

76.    Title VI of the Civil Rights Act of 1964 provides that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d.

77.    Private individuals can sue to enforce Title VI and obtain both injunctive relief and damages. *See Alexander v. Sandoval*, 532 U.S. 275, 279-80 (2001).

78.    The Society receives "Federal financial assistance." §2000d. The Society is a 501(c)(3) organization that accepts charitable contributions. There is "little question" that "the provision of a tax deduction for charitable contributions" given to 501(c)(3) charitable organizations "is a grant of federal financial assistance within the scope of the 1964 Civil Rights Act." *McGlotten*, 338 F. Supp. 462. Having a tax-exempt status alone does not render an organization a federal program or activity in other circumstances. But the charitable-contribution deduction brings a 501(c)(3) organization's racial discrimination "within the scope of the 1964 Civil Rights Act." *Id.*

79.    Because of its 501(c)(3) tax-exempt status, the Society's donors "are permitted … to deduct the amount of their contributions on their federal income tax return." *Regan v. Taxation Without Representation of Wash.*, 461 U.S. 540, 543 (1983). The charitable-contribution deduction "operates in effect as a Government matching grant." *McGlotten*, 338 F. Supp. at 462. There is "no difference" between "the provision of Federal property" and "a tax deduction in the form of a matching grant provided for contributions to causes deemed worthy by the Internal Revenue Code." *Id.*

80.    To be a 501(c)(3), the organization must not violate fundamental public policy by engaging in racial discrimination. *Bob Jones*, 461 U.S. at 592. In other words, agreeing not to violate engage in racial discrimination is a key condition for enjoying the charitable-contribution deduction. *See id.* at 592-94.

81.    The ACS Scholars Program constitutes a "program or activity" under Title VI. The term "program or activity" means "all of the operations of … [a]n entire …

21

private organization" if that organization (i) accepts assistance "as a whole" or (ii) is "principally engaged in the business of providing education." §2000d-4a(3)(A). The Society meets both prongs. The 501(c)(3) tax-exemption status is extended to the Society "as a whole." §2000d-4a(3)(i).

82.    And the Society is principally engaged in education. Its purpose is to directly and indirectly further chemistry education—to "increase and diffuse chemical knowledge" and "to promote research in chemical sciences and industry." 36 U.S.C. §20502(2), (4). It fulfills its purpose by "provid[ing] … education" to its members and scientists and "support[ing] teaching and learning for students of all ages through grants and scholarships." ACS, *About ACS* (last visited Mar. 5, 2025), perma.cc/8RAX-BQ45. The Society provides a whole host of educational materials for chemistry teachers and students. *See* ACS, *Students & Educators* (last visited Mar. 5, 2025), perma.cc/4KR4-YR69. The Society directly teaches students about chemistry through its online educational content. ACS, *Explore Chemistry* (last visited Mar. 5, 2025), perma.cc/J2ZV-WTTC; ACS, *Chemistry Education Resources* (last visited Mar. 5, 2025), perma.cc/3MVB-8ZV5. It publishes ChemMatters Magazine and other books. ACS, *ChemMatters Magazine* (last visited Mar. 5, 2025), perma.cc/LJ6W-AUB4. It hosts National Chemistry Week. ACS, *National Chemistry Week* (last visited, Mar. 4, 2025), perma.cc/MP62-A5C4. And it engages in various outreach activities that include small-group and classroom discussions, stage demonstrations, and expos. ACS, *Chemistry Outreach Activities* (last visited, Mar. 4, 2025), perma.cc/DSZ5-L938. For teachers, the Society provides middle-

school chemistry lesson plans, simulations, and other educational tools. *See* ACS, *Middle School Chemistry* (last visited Mar. 5, 2025), perma.cc/HW9T-NQ58. The ACS Scholars Program is an "operation[]" run by—and within—the Society and therefore a "program or activity" under Title VI. §2000d-4a(3).

83.    The Society has caused and will continue to cause white and Asian students to be "excluded from participation in," "denied the benefits of," and "subjected to discrimination under" the ACS Scholars Program "on the ground of race, color, or national origin." §2000d.

84.    At a minimum, because the ACS Scholars Program cannot satisfy strict scrutiny, it violates Title VI. *See Gratz*, 539 U.S. at 275-76 n.34; *cf. Harvard*, 600 U.S. at 308-09 (Gorsuch, J., concurring) (observing that Title VI makes it "*always* unlawful to discriminate among persons even in part because of race" without subjecting racial classifications to strict scrutiny).

## PRAYER FOR RELIEF

Do No Harm asks this Court to enter judgment in its favor and against the American Chemical Society and to provide the following relief:

A.    A declaratory judgment that the Society, through its ACS Scholars Program, is violating §1981 and Title VI.

B.    A permanent injunction barring the Society from seeing or considering applicants' race when selecting ACS Scholars.

C.    If necessary before the program's next cycle, a preliminary injunction barring the Society from opening or closing the application window for the ACS Scholars Program until further order of the Court.

D.     Nominal damages of $1.

E.     Reasonable costs and expenses of this action, including attorneys' fees, under 42 U.S.C. §1988 and any other applicable laws.

F.     All other relief that Do No Harm is entitled to.


Dated: March 5, 2025                    Respectfully submitted,

                                        */s/ Cameron T. Norris*
                                        Thomas R. McCarthy (DC Bar #489651)
                                        Cameron T. Norris
                                          *Lead Counsel*
                                        Frank H. Chang (DC Bar #1686578)
                                        Zachary P. Grouev
                                        CONSOVOY MCCARTHY PLLC
                                        1600 Wilson Blvd., Ste. 700
                                        Arlington, VA 22209
                                        (703) 243-9423
                                        tom@consovoymccarthy.com
                                        cam@consovoymccarthy.com
                                        frank@consovoymccarthy.com
                                        zach@consovoymccarthy.com

                                        *Attorneys for Do No Harm*

# VERIFICATION

I, Kristina Rasmussen, declare as follows:

1.     I am over the age of 18, of sound mind, and otherwise competent to sign this verification.

2.     I am the Executive Director of Do No Harm.

3.     I have reviewed this verified complaint.

4.     For the allegations within my personal knowledge, I believe them all to be true.

5.     For the allegations not within my personal knowledge, I believe them to be all true based on my review of the cited materials and Do No Harm's communications with Member A and her mother.

6.     Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 5, 2025

Kristina Rasmussen
Executive Director of Do No Harm